UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTONIO TORRANCE,

              Petitioner,

    v.

ROY GIRDICH, Superintendent of
    Upstate Correctional Facility,

              Respondent.

**DECISION AND ORDER**
No. 03-CV-6498L

_____

## INTRODUCTION

Petitioner, Antonio Torrance ("Torrance") filed this petition *pro se* for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("§ 2254") challenging his conviction in New York State County Court, Monroe County, on two counts of Rape in the First Degree (New York Penal Law ("P.L.") § 130.35(1)). Torrance was convicted by a jury and sentenced, as a second felony offender, to two consecutive 25-year terms in state prison. He is presently incarcerated at the Clinton Correctional Facility pursuant to the judgment of conviction. For the reasons set forth below, Torrance's § 2254 petition is denied and this action is dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

By Monroe County Indictment No. 555/99, Torrance was charged with one count of Rape in the First Degree (P.L. § 130.35(1)) and two counts of Sodomy in the First Degree (P.L. § 130.50(1)) alleging Torrance had sexual intercourse and deviant sexual intercourse with Lisa Deutsch ("Deutsch"), by forcible compulsion. In the same indictment, Torrance was also charged with two separate

counts of Rape in the First Degree and Sodomy in the First Degree for the sexual intercourse and deviant sexual intercourse by forcible compulsion with Nicole Childs ("Childs"). Torrance pled not guilty to all five counts and proceeded to a jury trial before the Honorable David D. Egan on March 13, 2000.

The charges stemmed from two separate incidents that occurred at 227 North Union Street in the city of Rochester on August 16, 1999. The first incident involved Deutsch, who came upon Torrance in the early morning hours of August 16th, while she was driving around the city of Rochester looking for drugs. T.[1] 317. Torrance jumped into her car and instructed her to drive to 227 North Union Street, where he would help her get drugs. Id. Once they arrived at the house, Torrance went in search of drugs and left Deutsch at the house. T. 318. Torrance returned with crack cocaine and directed Deutsch to go upstairs where she could have some of the crack cocaine. T. 320. After they started to smoke the cocaine, Torrance indicated to Deutsch that they "had an agreement" and she needed to take off her clothes and fulfill her part of the deal by having sex with him, at which point Deutsch refused and denied that they had an agreement. T. 322. Deutsch testified at trial that Torrance then became upset, began threatening her, and bolted the door shut with a knife. T. 322-23. Fearful that Torrance was going to harm her, Deutsch testified that she complied with his

---

[1] Citations to "T." refer to the trial transcript.

demands as he assisted her in removing her clothes. T. 324. Deutsch testified that Torrance began to perform oral sex on her despite her protests and then forced her to perform oral sex on him. T. 325. Next, Torrance "pinned" Deutsch down on a bed and forced Deutsch to have unprotected sexual intercourse with him, in spite of her repeated protests. T. 326-27.

Following this incident, Deutsch testified that "all [she] wanted to do was get high," which is why she left the building with Torrance to look for items in her apartment to sell in order to buy drugs. T. 329. They proceeded to sell her microwave and use the profits to purchase more cocaine before returning to 227 North Union Street where they smoked the cocaine in a matter of minutes. T. 329-331. After smoking the cocaine, Torrance convinced Deutsch to allow him to borrow her car for unknown reasons and Deutsch, upon hearing a friend's voice outside the house, quickly left the house and went to that friend's house. T. 333-334. While Deutsch initially did not relate these events that occurred after the rape in her statements to the police and in preliminary hearings, she testified at trial that she previously failed to do so because she thought these events could be used against her and that no one would believe her allegations. T. 338.

Later that night, Deutsch told her friend, Mary, about the events that occurred that morning and Mary consulted her family and called police. T. 335. After the police arrived, Deutsch was taken

to the Genesee Hospital, where a physical examination was performed and she was interviewed by Officer Aaron Brown and Sergeant Mark Beaudrault, both of the Rochester Police Department. T. 252. At approximately 5:30 a.m., Sergeant Beaudrault responded to 227 North Union Street in the City of Rochester to investigate and search for evidence relating to the rape of Deutsch with another officer, Officer Raymond Benitez. T. 253. Upon arrival, Sergeant Beaudrault testified that the building at 227 North Union Street appeared abandoned. Id. Moreover, the inside of the house was "run down," with holes in the floor, no electricity or water, very little furniture, and trash strewn throughout the house. T. 255. As the officers moved through the house, they did not hear any noises and proceeded to search the second floor. T. 256-57. As they searched the second floor of the house, both officers came to a closed door that had no knob and could not be opened. T. 257. Sergeant Beaudrault ordered Officer Benitez to breach the door, which he did by kicking the door open. Id.

Once the door was opened, it became apparent that it was being held shut by a couch. Upon entering the room, the officers saw two individuals, a black male and white female, on a bed in the corner of the room. T. 258-60. The black male, who was later identified as Torrance, leapt from the bed towards a couch, where a knife would later be recovered. T. 243, 263. The officers ordered Torrance not to move and asked the white female, who was identified

as Childs, if she was voluntarily at the house. T. 263. Childs responded that she was being held there against her wishes. Id. At trial, Childs testified that she went to 227 North Union Street around 1:00 p.m. on August 16th with a friend, Richie, who had purchased crack cocaine for them to smoke with Torrance. T. 381, 383. Over the next six hours, Childs, Richie, and Torrance smoked crack cocaine. T. 385. At some point, Richie left to purchase more drugs and when he returned, Childs testified that Torrance told Richie that she had left and not to come back into the house. T. 386. However, Torrance prevented Childs from going to the window to let Richie know that she was still inside the house. Id. Childs also testified that Torrance pushed a couch in front of the door and secured the door by jamming scissors into the doorframe, blocking the only exit from the room. T. 387. Torrance then offered Childs more cocaine and after they finished smoking the cocaine, he insisted that she now "owed him" for providing the drugs. T. 388. Childs testified that she never saw Torrance purchase any of the cocaine that they had smoked that day nor did she ever enter into an agreement with him to purchase cocaine for sexual favors. Id. At this point, Childs testified that Torrance demanded she perform oral sex on him and she complied with this demand, despite not wanting to do so only because Torrance promised that she could leave if she followed his demands. T. 389. Torrance then told Childs to take off her clothes and lay next to

him, Childs testified that she followed these orders because Torrance was acting "very controlling and staring" at her. T. 390. Next, Torrance started hitting and slapping Childs' face and then forced her to have sexual intercourse with him. T. 391. After continuing this conduct for three or four hours, Childs testified that Torrance did fall asleep but she felt that could not escape because Torrance began to stir every time she attempted to move off the bed. T. 396. Childs eventually fell asleep and was awakened when the officers kicked the door in. Id. After the officers entered the room, Childs told them that she was not there voluntarily. Thereafter Childs was taken to Rochester General Hospital where she was examined and a rape kit was completed. T. 397.

At trial, Deutsch and Childs testified about the incidents that occurred on August 16, 2009, as well as the officers who interviewed the victims and searched the house. Following the People's case, Torrance's counsel moved to dismiss all five counts of the indictment, arguing that the People failed to prove a *prima facie* case. T. 518-21. The trial judge denied this motion and the jury ultimately convicted Torrance of two counts of Rape in the First Degree (P.L. § 130.35(1)), one count for the incident involving Deutsch and the other count for the incident involving Childs. Tr. 618-20. Torrance was acquitted on the remaining three counts.

On March 31, 2000, when Torrance appeared for sentencing, his appointed attorney from the Monroe County Public Defender's Office, Julie Cianca ("Cianca"), did not appear with him. S.[2] 2. Instead, Cianca's supervising attorney from the Monroe County Public Defender's Office, Roger Brazill ("Brazill"), replaced her as counsel for the sentencing phase of the trial. S. 3. The trial judge asked Torrance if he had any objection to Brazill representing him during the sentencing phase, to which Torrance objected and pointed out that Cianca had represented him for the whole trial and had better knowledge of his case. Id. The trial judge did not see Cianca's absence as a reason to delay Torrance's sentencing, especially since her supervisor, Brazill, was present and had met with Torrance prior to sentencing. Id. During sentencing, Torrance continued to make it known that Cianca should have continued to represent him but, in a contradictory fashion, he asserted his belief that she was "high on drugs." S. 7-8. The trial judge noted Torrance's comments and proceeded with sentencing. S. 14. During sentencing, the trial judge reviewed Torrance's criminal history, which spanned fifteen years, and stated that Torrance's background produced no evidence that would warrant leniency. S. 15-19. Torrance was sentenced to a term of twenty-five years incarceration for each of the two counts to be served consecutively. S. 20.

---

[2] Citations to "S." refer to the sentencing minutes.

Represented by new counsel, Torrance appealed his conviction to the New York State Supreme Court, Appellate Division, Fourth Department, which was unanimously affirmed. People v. Torrance, 298 A.D.2d 857(4th Dept. 2002). Leave to appeal to the New York Court of Appeals was denied. People v. Torrance,99 N.Y.2d 540 (2002).

In his petition for federal habeas relief, Torrance asserts the following grounds for relief: (Claim I) he was denied effective assistance of counsel at the sentencing portion of his trial); (Claim II) the trial court committed reversible error by upholding the warrantless search of his residence; (Claim III) his sentence of fifty years was harsh and excessive; and (Claim IV) the trial court committed reversible error by curtailing the defendant's cross-examination of Nicole Childs' sexual history. See Petition ("Pet.") (Docket No. 1). Respondent answered the petition and interposed the defenses of non-exhaustion, procedural default, and non-cognizable claims for federal habeas review with regard to all of Torrance's claims. Torrance replied to the Respondent's application for dismissal, in which he argues any procedural default is excused because of ineffective assistance from his appellate counsel. See Petitioner's Answer in Opposition to Respondent's Application for Dismissal (Docket No. 7).

## DISCUSSION
**Exhaustion Requirement**

Before a federal court can grant habeas relief, a petitioner must have exhausted all state court remedies. See O'Sullivan v.

Boerckel, 526 U.S. 838, 842 (1999). This exhaustion requirement is codified under 28 U.S.C. § 2254(b)(1)(A) and extends to every federal claim asserted by a petitioner. Caballero v. Keane, 42 F.3d 738, 740 (2d Cir. 1994). The exhaustion requirement prohibits a federal court from granting an application for a writ of habeas corpus unless the petitioner has exhausted all of the remedies available in the courts of the state in which he or she was convicted, see 28 U.S.C § 2254(b)(1)(A), although the federal courts now have the discretion to deny a petitioner's unexhausted claims, see 28 U.S.C. § 2254(b). In particular, the exhaustion doctrine "requires . . . that state prisoners give state courts a fair opportunity to act on their claims." O'Sullivan, 526 U.S. at 844 (citing 28 U.S.C. § 2254(c)) (additional citations omitted). Thus, a petitioner has not exhausted all of the available state remedies if he or she still has the right under state law to raise, by any procedure, the federal question presented in his or her habeas petition. 28 U.S.C. § 2254(c). The Supreme Court has interpreted this as requiring petitioners to invoke "one complete round of the State's established appellate review process," including an application to "a state court of last resort when that court has discretionary control over its docket." O'Sullivan, 526 U.S. at 843, 845.

Respondent raises the defense of non-exhaustion with regard to Torrance's Claim I, III, and IV. See Respondent's Memorandum of Law

("Resp't Mem.") at 1-2 (Docket No. 6). Respondent argues that Torrance's failure to present these claims in his letter for leave to appeal to the New York Court of Appeals renders the claims unexhausted. Id. Upon review of Torrance's letter for leave to appeal, this Court finds that Torrance does not raise any claims beyond his argument that his Fourth Amendment rights was violated by the trial court. See Petitioner's Letter for Leave, Respondent's Appendix ("App.")[3] H at 213-14. I therefore find that Claims I, III, and IV are unexhausted as these claims were not included in Torrance's application for leave to appeal to the New York Court of Appeals.

These claims, however, must be "deemed exhausted" since Torrance can longer attempt to exhaust claims in state court; he has already used the one direct appeal to which he is entitled, see N.Y. COURT RULES § 500.10(a), and if he were to raise these claims in a C.P.L. § 440.10 motion, the motion court would be obligated to dismiss them because they were raised on direct appeal. See N.Y. CRIM. PROC. LAW § 440.10(2)(a). Moreover, the state rules applicable to constructive exhaustion also operate to cause a procedural default of the claims presented on federal habeas review, which can only be overcome by demonstrating cause *and* prejudice, or that a fundamental miscarriage of justice will result. See Bossett v.

---

[3] Respondent's Appendix of Exhibits was submitted in connection with their answer to the present habeas petition.

Walker, 41 F.3d 825, 829 (2d Cir. 1994)(citing Wainwright v. Sykes, 433 U.S. 72, 87 (1977).

In the present case, Torrance offers the argument of ineffective assistance of appellate counsel as cause for the procedural default on Claims I, III, and IV. See Petitioner's Answer in Opposition to Respondent's Application for Dismissal at 2 (Docket No. 7). Moreover, Torrance claims that his appellate counsel's failure to raise Claims I, III, and IV in his letter for leave to appeal to the Court of Appeals has resulted in a "fundamental miscarriag [sic] of justice." Id. at 5. The Supreme Court recognizes that a claim of ineffective assistance of counsel may be cause to overcome a procedural default, however, it must be true, constitutionally deficient representation and a separately exhausted claim. Edwards v. Carpenter, 529 U.S. 446, 453 (2000) (citing Murray v. Carrier, 477 U.S. 478, 489 (1986)). Here, Torrance's claim of ineffective assistance of appellate counsel was neither raised in a state court nor was it mentioned in Torrance's original petition for federal habeas relief. I therefore find that Torrance has failed to independently and properly raise his claim of ineffective assistance of appellate counsel in the state courts, which renders this claim as unexhausted. See Edwards, 529 U.S. at 451; Murray, 477 U.S. at 489 ("a claim of ineffective assistance must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural

default"). Furthermore, Torrance has not demonstrated that his appellate counsel was truly ineffective by his failure to raise Claims I, III, and IV, which were already held to be without merit on direct appeal. See Torrance, 298 A.D.2d at 857-58. Thus, Torrance's claim of ineffective assistance of appellate counsel does not establish "cause" for the procedural default and therefore this Court need not reach the question of whether Torrance can show prejudice. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show both cause and prejudice in order to obtain federal habeas review, we need not, in light of our conclusion that there was no showing of cause, reach the question of whether or not [petitioner] showed prejudice."). Moreover, Torrance has not asserted that he is "actually innocent" of the charges on which he was convicted, which causes the "fundamental miscarriage of justice" exception to have no application in this case. See Coleman v. Thompson, 501 U.S. 722, 748 (1991) (citing Murray, 477 U.S. at 496)("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default"). Accordingly, I find that Torrance has not overcome the procedural default and Claims I, III, and IV are procedurally barred from habeas review.

**Petitioner's Fourth Amendment Claim is Not Cognizable on Federal Habeas Review**

In Claim II, Torrance argues that his Fourth Amendment rights were violated when police officers entered his "residence," without a warrant, and arrested him. See Pet. at 12 (Docket No. 1). Respondent argues to the extent that Torrance raises a Fourth Amendment claim, it is precluded from federal habeas review. See Stone v. Powell, 428 U.S. 465 (1976).

The Supreme Court has explicitly held that Fourth Amendment claims that have been litigated in state court are not cognizable on federal habeas review:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force.

Id. at 481-82; Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991). The Second Circuit, in interpreting Stone v. Powell, has recognized that federal courts may review Fourth Amendment claims on federal habeas review in only two extraordinary situations: "(a) if the state has provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in

the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992).

Torrance's argument is not that New York State failed to provide corrective procedures or that he did not have access to these procedure, instead he alleges that the trial court wrongly decided to uphold a warrantless search that led to his arrest. See Pet. at 12 (Docket No. 1). I find that Torrance cannot meet either exception that would allow a review of his Fourth Amendment claim. With regard to subsection (a) of the test enunciated by the Second Circuit in Capellan, it cannot be alleged that New York State failed to provide sufficient avenues through which Fourth Amendment claims may be raised and remedied. The "federal courts have [on prior occasions] approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10 et seq. . . . , as being facially adequate." Capellan, 975 F.2d at 70 n. 1 (quoting Holmes v. Scully, 706 F.Supp. 195, 201 (E.D.N.Y.1989); citing Gates v. Henderson, 568 F.2d 830, 837 & n. 4 (2d Cir.1977), Shaw v. Scully, 654 F. Supp. 859, 864 (S.D.N.Y.1987)). Pursuant to N.Y. Crim. Proc. Law § 710.10, a defendant in a criminal case may move to suppress evidence prior to, or in some cases, during trial. Gates, 568 F.2d at 837. The Second Circuit concluded in Gates that the issue of whether New York State provides adequate procedures for litigating Fourth Amendment claims "cannot be open to serious challenge." Id.

Moreover, Torrance took advantage of the opportunity provided by New York statutory law to challenge the legality of the search of his "residence" at a pre-trial hearing. Thus, Torrance cannot claim that New York statutory law did not afford him an opportunity to seek redress for his Fourth Amendment claim.

The Second Circuit test for determining whether a Fourth Amendment claim can be heard on federal habeas review, under subsection (b) set forth in Capellan (supra), Torrance must demonstrate that an "unconscionable breakdown" in the State's corrective measures occurred because the state court "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." Capellan, 975 F.2d at 71 (internal quotation marks omitted). Torrance does not and cannot argue that his suppression hearing conducted before the trial court suffered from any defect other than resulting in a decision that was adverse to Torrance's position. Following the trial, Torrance litigated his Fourth Amendment claims on direct appeal to the Appellate Division, Fourth Department, and raised the issue in his letter for leave to appeal to the New York Court of Appeal. Both courts upheld the trial court's denial of Torrance's motion to suppress the evidence based on a violation of his Fourth Amendment rights.

It is evident that Torrance is raising this Fourth Amendment claim on federal habeas review because he disagrees with the state court's factual findings, which the Second Circuit has explicitly stated does not amount to an "unconscionable breakdown" to justify

an exception to Stone v. Powell. See Capellan, 975 F.2d at 71 ("Even if Capellan were correct in his allegation that the Appellate Division erroneously decided this issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the federal court may have reached a different result.") (citing Gates, 568 F.2d at 840 ("Stone v. Powell . . . holds that we have no authority to review the state record and grant the writ simply because we disagree with the result reached by the state courts.")). Torrance's petition requests that this Court conduct a *de novo* factual review of his Fourth Amendment claims, which both the Supreme Court and the Second Circuit have explicitly held that this Court is precluded from collateral federal review of a state court conviction. See Stone, 428 U.S. at 493-94; see also Capellan, 975 F.2d at 71. Accordingly, this claim is dismissed.

## CONCLUSION

For the reasons stated above, Antonio Torrance's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied in its entirety, and the petition is dismissed. Further, because Torrance has failed to make a substantial showing of a denial of a constitutional right, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253.

**ALL OF THE ABOVE IS SO ORDERED**

s/Michael A. Telesca

MICHAEL A. TELESCA
United States District Judge

Dated: Rochester, New York
July 22, 2009